## Case No. 16,911.

### The VELOCITY.

### [13 Law Rep. 61.]

District Court, N. D. New York. Feb. 2, 1850.

MARITIME LIENS—STATE STATUTES—SURPLUS PROCEEDS.

The act of the legislature of the state of Ohio, entitled "An act providing for the collection of claims against steamboats, and other water craft, and authorizing proceedings against the same by name," passed February 26, 1840, confers no lien in favor of the description of persons therein mentioned. and consequently such persons having claims against a vessel which has been sold under a decree of a district court of the United States in an admiralty suit in rem, are not entitled to payment out of the surplus proceeds of the sale of such vessel. Quære, whether if the act gave a lien. it could be enforced out of the state of Ohio.

The schooner Velocity was owned by citizens of the state of Ohio; and having been sold under a decree of this court, in a suit for wages, and a portion of the proceeds of the sale remaining in the registry of the court after payment of the amount decreed, petitions were exhibited in behalf of divers persons, being also citizens of Ohio, asking payment out of such surplus proceeds, for supplies by them furnished for the use of the Velocity during the last season of lake navigation. The supplies having been furnished in the home ports of the vessel, there was no pretence that an implied lien was given by the general maritime law of the United States: but the petitioners insisted that they were entitled to sue in virtue of an act of the legislature of Ohio, cited and commented on in the judgment of the court. The cases were submitted without argument, and with several others of a like nature against the surplus proceeds of the steamer Ohio, were taken under advisement by the court.

CONKLING, District Judge. The question whether the court can properly afford the relief sought by the petitioners, being one of considerable importance, not only to them but to the public at large, I have been anxious since the petitions were exhibited, to give to the subject the best consideration in my power. So far as I am informed, the question is wholly new: it is so, at least, in this court. This, however, is not the first time that the attention of the court has been called to the statute of Ohio, under which the question arises. It being a settled doctrine of our maritime jurisprudence, that where a lien is given to the material-man by the law of a state, such a lien may be enforced by a suit in rem in the admiralty, notwithstanding the supplies have been furnished in a home port; several applications were made to the court in behalf of citizens of Ohio, not long after the passage of the late act of congress, imposing a quasi admiralty jurisdiction on the district courts, of certain cases arising on the lakes, for original process of arrest against vessels owned in Ohio, to enforce payment for supplies furnished in that state. But for reasons then assigned, and without entering into a critical examination of the act, for the purpose of ascertaining whether it conferred a lien enforceable by admiralty process in the district of Ohio, my opinion was, that I should not be warranted, as the judge of this district, in assuming the jurisdiction thus invoked, and I accordingly declined its exercise. And in a recent case which it was supposed might turn upon a sale of the vessel under process from a court of the state of Ohio, in pursuance of this act, its provisions were again brought into discussion. The case, however, was decided upon other grounds. With regard to the particular question, which it has now at length become my duty to decide, although it has been repeatedly mentioned in court, I have cautiously abstained from intimating any opinion upon it (for in truth I had formed none), contenting myself, when declining to entertain original suits founded upon it, for demands of this sort, with saying, that if parties so situated were entitled to relief in any form, in this court, it could only be by a suit against surplus proceeds.

Having thus explained the actual predicament of the question in this court, I proceed in the next place, as well as I am enabled by the light of judicial decisions to do, to state the general principles on which the rights of the petitioners depend. These principles are of no inconsiderable practical importance. Vessels of great value are sometimes allowed by their owners to be sold, to satisfy demands of comparatively small amount; and as the entire proceeds of sales under the process of the court are in all cases paid into the registry, it thus happens that in some instances a large sum, and in most instances, a portion of the proceeds, remains, after payment of the amount decreed to the libellant. and to peti-

tioners, if any (as there generally are in this court), who, also having maritime liens against the vessel, intervene for their interest, pendente lite. Of sums so remaining in the registry, the court is bound to make a just disposition; and in discharging this duty, to proceed with the same cautious circumspection, and the same strict regard to law and justice, as in the decision of original suits. Prima facie, such surplus belongs to the person who was the owner of the vessel before sale; and no reason to the contrary appearing, it is a matter of course to direct its payment to him —proper care being first taken, especially if he had not before appeared and been admitted as claimant, to ascertain with legal certainty that he was in fact such owner. But the right of intervention continues, notwithstanding the consummation of proceedings in the original suit, and may be exerted by petition against the fund remaining in the registry; and with respect to demands which constituted a lien on the ship in specie, and of which, therefore, the court might have taken cognizance in an original suit, no doubt has ever been entertained, that the court has authority and was bound to direct their payment out of such surplus fund. To decree a sale of the property to which the lien attached, equally with that on account of which the property had been brought under the power of the court, and thus to give to a third person, as purchaser, an indefeasible title to it, discharged of such lien —and then to direct the payment of the surplus proceeds to the debtor, in preference to the holder of such lien, would be manifestly unjust. On the other hand, however, it has never been supposed that the claims of the mere general creditors of the owner could be recognized in this form. It is true, indeed, in England, although, latterly, until by a recent act of parliament (3 & 4 Vict. c. 65) the law was changed, material-men, even in the case of a foreign vessel, were held not to have a lien on the ship, that it was the practice of the high court of admiralty, nevertheless, to direct their payment out of surplus proceeds, provided the demand was liquidated and undisputed: but it seems to have been done under the idea, that this might be rightfully regarded as a remnant of the authority formerly exercised by the court, to entertain original suits in favor of material-men, but subsequently restrained by prohibitions from the courts of common law. The Neptune, 3 Hagg. Adm. 129. But claims depending wholly upon the common law were uniformly rejected as not cognizable in the admiralty at all; and so rigorously was this principle enforced, that even mortgagees and judgment creditors after levy on execution, were excluded. The Portsea, 2 Hagg. Adm. 84; The Exmouth, Id. 88, note; The Fruit Preserver, Id. 181; The Prince George, 3 Hagg. Adm. 376; The Percy, Id. 402; The Flora, 1 Hagg. Adm. 298, 303. In the case last cited, however, in which the high court of admiralty directed the surplus proceeds to be paid to the owner, in prefer-

ence to the sheriff who had levied upon the ship before its arrest by the admiralty process, the court of delegates, on appeal, ordered the money to be paid to the sheriff, being of opinion, that "although the court of admiralty cannot enter into the contracts of general creditors, yet it may be bound to take a judgment on record as a debt." And, now, by a late act of parliament (3 & 4 Vict. c. 65), that court is authorized to give relief to mortgagees.

In our own courts, the first reported case I have met with, in which the right of intervention against surplus proceeds was discussed, is that of Gardner v. The New Jersey [Case No. 5,233], decided by Judge Peters in 1806. At that time, the only reported English case, tending to shed any light on the subject, which had probably reached this country, was that of The Favourite, 2 C. Rob. Adm. 232, in which Sir William Scott alluded to a practice of the court, allowing the claims of material-men against surplus proceeds in the case of a foreign ship. The views of the subject then entertained by Judge Peters, may be gathered from his own words in the following extract from his judgment, in the above cited case of the New Jersey, in which a petition against the surplus proceeds of the sale of the vessel was exhibited in behalf of the master, for money by him advanced on account of the ship, and another in behalf of a person who served on board in the capacity of physician, during a voyage from Philadelphia to Canton and back again: "When I first came into this court, I made, in several instances, distribution of surplus moneys, under the idea that I had power to do so, agreeably to the doctrine now stated, to justify me in granting the prayers of the petitions. But on experience, I found myself involved in many difficulties and mistakes, in the application of this doctrine. It was one among the mass of irregularities I had to encounter, before I established, by frequent decisions, and with much consideration, the general principles which now prevail. I found it best and safest to fix some general rules applicable to most cases, though at times some anomalous instances should occur, inducing particular hardships. The rule by which I have governed myself for several years past, is, that it shall appear that a sum claimed out of the surplus or remnant, is either of itself, or in its origin, a lien on the ship, or other thing out of which the moneys were produced. I shall continue to adhere to the principles I have endeavored to establish, not to admit the distribution or payment of surplus, to others than those who originally had liens, or legal appropriations, on the object from which the moneys in court were raised. I deem it an exclusion from a distribution, or a claim to a surplus, unless a lien or appropriation is precedently and legally fixed, that those who claim such distribution, could not sue in the admiralty for their demands." In the cases of Brackett v. The Hercules [Case No. 1,762] and Harper v. New Brig [Id. 6,090], decided many years later in the same court,

Judge Hopkinson adopted the principles thus laid down by Judge Peters, applying them in the one case in favor of a mortgagee, and in the other against a mere personal creditor. From the case of The Mary Ann [Id. 9,195], I infer also, that the doctrine of these cases would be approved by the distinguished judge of the district of Maine, and I am not aware that it has ever been judicially controverted. I have accordingly considered it to be my duty, thus far, to follow it. (A more ample exposition of this subject may be found in Conk. Adm. pp. 38–50, 540–562.) The question for decision in the present case, therefore, is, whether the petitioners are to be considered as having had a lien on the Velocity. "A lien," said Lord Ellenborough, in Wilson v. Balfour, 2 Camp: 579, "is a right to hold"; and in the case of Hammonds v. Barclay, 2 East, 227, 235, Mr. Justice Gross. delivering the opinion of the court. defines a lien to be "a right in one man to retain that which is in his possession belonging to another, till certain demands are satisfied." At common law, therefore, no lien can subsist without possession. With liens conferred by the maritime law it is otherwise, and valid liens independent of possession may also be created by statute. This has been done by the legislatures of several states of the Union, in favor of the class of persons to which the petitioners allege themselves to belong. Thus by a statute of the state of Maine, it is enacted "that all ship-carpenters, calkers, blacksmiths, joiners, and other persons who shall perform labor or furnish materials for or on account of any vessel building or standing on the docks, by virtue of a written or parol agreement, shall have a lien on such vessel for his wages." Read v. Hull of a New Brig [Case No. 11,609]. "A similar act has been passed in Pennsylvania, the preamble to which declares that ship-building is an important branch of the commerce of the state; that tradesmen employed in this business are liable to losses by reason that the persons employing them are frequently masters of ships, strangers, and persons having no fixed property in the country." · And to remedy this evil, it is enacted, "that ships and vessels of all kinds, built, repaired and fitted within this state, are hereby declared to be liable and chargeable for all debts contracted by the masters or owners thereof, for or by reason of any work done or materials found or provided by any carpenter, blacksmith and others, for, upon, and concerning the building, repairing, fitting, furnishing and equipping such ship or vessel, in preference to any and before any other debts, due and owing from the owners thereof." Harper v. New Brig [supra]. Not having these statutes of Maine and Pennsylvania in full before me, I am not apprized of the limitations and conditions which they impose, nor of the forms of proceeding which they enjoin. But an act for the like purpose has also been passed in the state of New York, which enacts as follows.

"Section 1. Whenever any debt, amounting to fifty dollars or upwards, shall be contracted by the master, owner, agent or consignee of any ship or vessel within this state, for either of the following purposes. 1. On account of any work done, or materials or articles furnished in this state, for or towards the the building, repairing, fitting, furnishing, or equipping of such ship or vessel; 2. for such provisions and stores furnished within this state, as may be fit or proper for the use of such vessel, at the time when the same were furnished; 3. on account of the wharfage and expenses of keeping such vessel in port, including the expenses incurred in employing persons to watch her:

"Sec. 2. When the ship or vessel shall depart the port at which she was, when such debt was contracted, to some other port within this state, every such debt shall cease to be a lien, at the expiration of twelve days after the day of such departure; and in all cases such lien shall cease immediately after the vessel shall have left this state."

The act then proceeds, in forty-one additional sections, to prescribe with great particularity the forms of proceeding to enforce the liens it confers, and to define the rights of the parties concerned. It contains, among others. the following provisions: The application for the warrant of arrest is to be made to a commissioner authorized by law to perform the duties of a justice of the supreme court at chambers, or in the city of New York to a justice of the supreme court of law therein: when a warrant is issued. no other warrant shall issue against the same ship or vessel, unless the first is superseded: notice of the arrest is to be published in one or more newspapers at least once a week for three successive months, requiring all persons having claims, which by the act are declared to be a lien on the vessel, to deliver an account thereof to the officer issuing the warrant, within three months after the first publication of the notice, on pain of forfeiting their remedy against the vessel; and all persons having such claims may at any time before the expiration of the notice, deliver to the said officer an account thereof in writing, verified by oath, and shall thereupon be deemed an attaching creditor, on a footing of equality with him at whose instance the warrant was issued: all liens not so presented shall cease: the proceeds of the sale of the vessel, or of the security taken in lieu of it, are to be distributed among all the creditors, who shall appear and establish their claims. The language of each of these three statutes. it will be observed, is perfectly explicit, and such as to leave no room for doubt that they were intended to confer liens equal in efficacy to a lien at common law founded on possession; or a lien given by the maritime law, which is preferred to the title of a bona fide purchaser without notice. The Chusan [Case No. 2,717]. Indeed, this is of the very essence of a lien, and is that quality which gives it efficacy and value; and even to the title of

the United States, acquired by forfeiture. Id.; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409; Cond. R. 631.

Having thus endeavored to pave the way for the purpose, I proceed to the examination of the statute of Ohio, on which the petitioners rely. The title of the act, and those sections of it which more particularly require attention, are as follows:

"An act providing for the collection of claims against steamboats, and other water crafts, and authorizing proceedings against the same by name.

"Section 1. Be it enacted, &c. That steamboats and other water craft navigating the waters within or bordering upon this state, shall be liable for debts contracted on account thereof, by the master, owner, steward, or consignee, or other agent, for materials, supplies, or other labor in the building, repairing, furnishing or equipping the same, or due for wharfage; and also for damages arising out of any contract for the transportation of goods or persons, or for injury done to persons or property by such craft, or for any damages or injury done by the captain, mate, or other officer thereof, or by any person under the order or sanction of either of them to any person who may be a passenger or hand on such steamboat or other water craft, at the time of the infliction of such damage or injury.

"Section 2. Any person having such demand may proceed against the owner or owners, or master of such craft, or against the craft itself.

"Section 3. When such suit shall be commenced against the craft, the plaintiff shall file a precipe to that effect, naming said craft, if she have a name, and if not, giving a substantial description of the same; and with it a bill of the particulars of his demand, verified by his own affidavit, or that of his agent or attorney, or other credible person.

"Section 4. The clerk of the proper court shall, on receiving such precipe, issue a warrant, returnable as other writs, directing the seizure of such craft by name or description as provided for in the third section of this act, or such part of her apparel or furniture as may be necessary to satisfy the demand, and to detain the same until discharged by due course of law, and the officer executing the writ shall return with it an inventory of the effects seized and held under it."

Section 5 authorizes the redelivery of the property arrested on bond, with sufficient sureties in double the amount claimed by the plaintiff.

Section 6 authorizes the sale on execution, of the property arrested, to satisfy the judgment, if any, which may be rendered for the plaintiff, and directs that "the surplus money, if any, arising from such sale, shall be returned to the owner, master, or agent, on demand, as the surplus money is in other cases of execution; and if the proceeds of the sale shall fall short of satisfying the judgment, the balance shall remain to be collected on execution, as upon other judgments."

Section 7 gives jurisdiction to justices of peace of all cases arising under the act, when the amount claimed shall not exceed $100.

Section 8 gives a right of action for the recovery of damages against any person who shall commence a suit under the act without reasonable or probable cause.

Sections 9 and 10, which are the only remaining ones, give an appeal from judgments rendered under the act, and when the proceeding has been against the vessel by name, regulate the proceedings on such appeal.

Now, in the first place, it is to be observed, that neither the term "lien," nor any other word of the like import, occurs either in the title or in the body of this act; and yet, if it had really been the intention of the legislature of Ohio to introduce so important an innovation as that of conferring a lien, not only in favor of materialmen, as has been done by the other states above mentioned, but also "for damages arising out of any contract for the transportation of goods or persons, or for injury done to persons or property by such craft; or for any damage or injury done by the captain, mate, or other officer thereof, or by any person under the order or sanction of either of them, to any person who may be a passenger or hand on such steamboat or other water craft"; if such had been the design of the act, it is certainly very extraordinary that it should not have been directly, and unequivocally declared. In the total absence of any direct expression of the legislative will to this effect, recourse must therefore be had to the tenor of the act, in order to ascertain whether such a design can fairly be inferred from its provisions. It must be added also, that it can be imputed upon no light grounds; it should at least appear to be entirely consistent, not only with all that the act contains, but also with whatever it omits, which, had such been its intent, it may reasonably be presumed would have been found in it. The primary design of the act unquestionably was to provide additional security for the description of persons therein specified. But it is the universally recognized duty of the lawgiver, in providing a remedy for one evil, to be very cautious not to introduce other evils of equal or greater magnitude. Now, it is manifest that the interests of trade must unavoidably suffer by the multiplication of secret liens upon property, and especially upon vessels actively engaged in the coasting trade; and hence the ample provision made by law, in many, probably in all of the states, and, as I am informed, in Ohio among the rest, for the recording of mortgages as well upon personal as upon real property. If therefore it was intended by the act in question to create a multitude of such liens, is it not reasonable to suppose that care would have been taken to restrict them to the narrowest limits compatible with their design, as was done by the New York statute? But the Ohio act contains no limitation whatever, either as to

amount, time, or place; and if it confers a lien, there is nothing in its provisions to forbid the arrest and sale of a vessel, for any one of the numerous specified causes, whether arising from contract or not, years after the cause of action arose, although the vessel, in the mean time, may have become the property of many successive owners ignorant of the incumbrance. It has been contended, moreover, on a former occasion, in this court, that the liens given by this act, and in favor of material-men and others mentioned in this act, are equivalent to the most favored maritime liens, and consequently that a judgment in a proceeding in rem under the act, has all the force of a decree in an action in rem in the admiralty. If so, a sale under such judgment would confer upon the purchaser an indefeasible title against all the world, discharged of all liens of whatsoever nature, as well antecedent as subsequent. But the conclusive effect of a decree in rem in the admiralty, results exclusively from the principle that all the world, as it is said, are parties to the suit—all persons having an interest in the thing proceeded against, being entitled to intervene for their interest therein and being called upon to do so by the most effective forms of notice that can be devised. Now the New York statute, while in express terms it confers, under very narrow limitations, a lien in favor of material-men, which (in accordance with the maritime law) it declares shall have priority over all other liens except seamen's wages, studiously adopts throughout, as already shown, the precautionary principles and forms observed in the admiralty. The Ohio act, on the other hand, requires no notice of the arrest in any form; it makes no provision whatever for the intervention of third persons who may have demands against the vessel; but, on the contrary, expressly directs that when it is sold, the surplus proceeds, if any, shall be paid to the owner—thus at once extinguishing all other liens (even those created by itself, if, indeed, it creates liens), and exhausting the subject to which they attached. It is not my duty nor design, beyond the absolute exigencies of the question before me, to enter into any speculations touching other grave questions affecting the interests of lake navigation and commerce, to which this act seems adapted to give rise; still less shall I presume, without necessity, to sit in judgment on the wisdom of its provisions. But I must be permitted to observe that, considering the nature, uses, and value of the kind of property which it subjects to indiscriminate arrest (or in the language of this act, and also of that of New York, "seizure," a term properly appropriated to an arrest for the purpose of enforcing a forfeiture), and summary sale for debts or damages however inconsiderable, its operation must, under any admissible interpretation, be so very stringent, as strongly to inculcate the propriety of giving to it the mildest construction of which its language is susceptible. And although I have been accustomed to hear it spoken of, and may have been myself

led by imitation to speak of it, as "the lien law of Ohio," the conclusion at which I have now arrived, is, that this is a mistaken appellation, not in accordance with the legislative intent. Upon mature consideration I am thoroughly convinced, that in declaring the vessel "liable" for debts contracted on her account, and for the damages specified in the act, nothing more was intended than to confer the privilege of arresting the vessel by mesne process, as the property of the delinquent party, and, unless security should be given, of having it detained in the custody of the law, to satisfy the judgment, if any, which the plaintiff might recover. With this construction, the provisions of the act are in harmony throughout, and they import nothing more. Thus interpreted, it is but an adoption, with respect to certain classes of persons, and with respect to one species of property, of the attachment laws of the New England states, and, in regard to non-resident debtors of this, and most or all of the other states of the Union —with this difference only, that, for obvious reasons, the necessity of the institution of a personal suit is dispensed with by the statute in question.

After protracted litigation, it has at length very recently been determined by the supreme court of the United States (Peck v. Jennes, 7 How. [48 U. S.] 612) that by the actual arrest of the property of the debtor on mesne process, in states where this form of remedy was sanctioned by law, the creditor acquired a "lien" or "security" within the purview of the proviso of the second section of the late bankrupt act; and it may readily be conceded, that by the arrest of a vessel under the statute of Ohio, while it remains the property of the debtor, the plaintiff obtains a prior right to satisfaction in the judicial tribunals of that state; but no lien attaches to the vessel before arrest. Consequently the claims of the petitioners against the surplus proceeds arising from the sale of the Velocity cannot be allowed. Had the terms of the act been such as to require the opposite construction, it would then have been my duty further to inquire, whether effect could properly be given to it in this court. Laws have no extra-territorial operation per se. The obligation of the laws of one nation within the territories of another is derived altogether from the voluntary consent of the latter. It depends exclusively upon what is denominated the comity of nations. "In the silence of any positive rule, affirming or denying or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy, or prejudicial to its interests." Story, Confl. Laws, 338. "But in a vast variety of cases, which may be put, the rejection of the laws of a foreign nation may work less injustice than the enforcement of them will remedy. And here every nation must judge for itself, what is its true duty in the administration of justice." Id. § 34; Bank of Augusta v. Earl, 13 Pet. [38 U. S.] 519, 589. "The comity of

nations is applicable reciprocally to the several states of this Union." Id. 590. Similar petitions have also been exhibited against the surplus proceeds arising from the sale of the steamer Ohio, and are to be considered as disposed of in like manner by this decision.